The issue before the court in this case is whether the force used against Ronnie Shumpert by engaging a police canine dog as well as shooting him to death was excessive and whether that officer, Tyler Cook, is entitled to qualified immunity. Now excessive force cases involving the police have three parts. Your honors, you have to have an injury, you have to have that injury was caused by the use of force that was excessive and that that use of force was objectively reasonable. Now from plaintiff's standpoint, we differ from the opinion of the district court because the district court in this case, Judge Aycock, says that Ronnie Shumpert did not have an injury, that he was underneath the house in a crawl space fighting with a canine Belgian and I may be pronouncing this wrong, Malinois police dog and came out uninjured. Therefore, plaintiffs have never even put evidence of injury before this court and I have to disagree with that, your honors. This man, after he was underneath the house fighting with this dog, admittedly fighting with this dog, came out of the house and as a result, he was, he had scratches, lacerations, bites, his jaw was broken, his lower mandible was crushed into his mouth in addition to being shot four times. So the idea that he was not injured at all and that plaintiffs haven't established an injury as part of this canine attack, use of force, I think is incorrect. I also think that the district court wants to have a canine under the house incident and then a shooting struggle with a police officer incident. I don't think that there's a surgical break in the chain of causation that would require that type of analysis. I think that we take the position if the court does not believe that Mr. Shumpert was injured by this dog at all, he's still in custody. I think that what typically can happen in these cases will merge so deeply into the facts that, you know, sort of some of the predicate thresholds we don't get to. Specifically, putting aside for the moment, but not abandoning the fact difference you have, the claim is premised in part on the policy of the municipality. So help us with understanding, I mean, you know what the law is in that area, so help us with understanding, you know, the appellant's view on that issue. Yes, sir. And the plaintiffs will admit that to attack city policy for the purposes of summary judgment is more difficult than the qualified immunity analysis on the individual officer. The city takes, sorry, the plaintiffs take the position that the city did have on their face proper policies regarding the use of canines and the use of force. However, these policies are attacked by the plaintiffs in two ways. That, number one, Mr. Cook, the officer, did not have the adequate training to even be a canine officer, and not just the adequate training, but the training that would rise to the level of deliberate indifference on behalf of the city, as well as the city totally embraces the actions of Officer Cook through their ability, which is still amazing to me, by the policymaker, Chief Bart Aguirre, or I might be pronouncing it wrong, Aguirre, to say, me as the police chief, we just have discretion to alter or amend the policies essentially as we see fit, and that's what he said in his deposition. Is it undisputed that he'd been a dog user in the military? Yes, sir, that's undisputed. He did have prior canine... In this incident, he'd had a dog for a couple years? Yes, sir, he did, but... It's also undisputed that he had some dog certificates, correct? Yes, sir, he'd been to some canine training academy through the either Mississippi... What would be the evidence showing deliberate indifference in the face of those undisputed facts? And I agree with you, Judge. It's a difficult position to argue. However, if policies are going to be worth anything in this society, then they have to be applied to the actual officers. And so if you want to take the training and experience part of the City of Tupelo policy and apply it to canine officers, specifically Officer Cook, he had not been a police officer long enough with the City of Tupelo. And he was... While he did have canine training and certification per his years of working with the dog itself, he did not have the requisite experience under the City of Tupelo policy. And he had been chosen, admittedly, over other more experienced canine officers for that position. So... What is it in the record that would show that there's any nexus between that and what happened? You have a man who has run from the police, hiding in the crawlspace. Certainly no policeman would go in there under those circumstances. He's got a dog, he sends it in. And as you said, there are two different things. One is the dog, the other is the shooting. But you left out the middle part. We only have one witness because your client is deceased. That's right. And that the witness said that when, after sending in the dog, that the decedent came out and started beating him and he was about to lose consciousness... Right. ...leading up to the shooting. So that's an important nexus, tie-in, between the two, the dog and the shooting. I understand, Your Honor. So the plaintiff takes the position that this is one continuous chain of events. The court may see it differently, that there's a pause. However, an important part of that, the in-between that you're looking for, is that, and the district court doesn't put this in its opinion, but the dog's still on the man. The testimony is that I, Officer Cook, shot Ronnie Shumpert four times while the dog is still on him. And under Cooper v. Brown, which came out of this same northern district, from 50 miles away from Judge Michael Mills, that came out prior to this actual incident, it holds for the proposition that a compliant, non-violent suspect, you know, a dog cannot continue to bite him. That's an unreasonable use of force to have a dog continue to bite a non-violent, compliant suspect. Well, again, taking the uncontradicted testimony of the officer, despite the dog biting on the decedent... Yes, sir. ...he is punching, he's on top, punching the officer in the face, and he's about to lose consciousness. And I disagree respectfully with the phrase, uncontradicted testimony. The district court has a line in its opinion saying, we are mindful at this point that we shouldn't make a credibility determination at the summary judgment stage. And then the district court goes on to make a testimony as to what happened. The lower court totally disregards several important factors, mainly that we have an expert witness that says one of the shootings, or one of the gunshot wound trajectories, was in an offensive manner. That is... Do you also have testimony that the four shots were fired in rapid succession? We do. And... How far could he get? Your Honor, that's a question for a jury. I mean, it really is. We're here making credibility determinations about what happened, and, you know, that's why we have juries in this court. It's not credibility when they're not too opposing. I know. And so, are we sending a message that we just need to make sure that we kill the other guy so we don't have another version of events? And, of course, that's crazy. We can't do that. So we as plaintiffs are stuck with the unfortunate situation that our client didn't live, and we can't tell the other side unless it's through physical evidence or... But you aren't disputing...you aren't disputing, as you described at the outset, that your client, instead of obeying the order, fought the dog. And then you said he then comes out at night on a single police officer. Yes, sir. So that's very different than Cooper. Cooper's...even if the intervening Cooper decision could be said to have just simply mirrored clearly established law, Cooper stands for the very different proposition that when a suspect has been completely subdued, the dog can't be commanded to keep attacking. But here, your client beats off the dog and emerges at night, at which point there are the four shots. And I take issue with that set of facts, Your Honor. Number one, there's no evidence that he ever beat off the dog. But you said at the outset he fought the dog. Yes, sir. Underneath the house. Okay. And the opinion in Brown, you know, if we can look at footnote two, says, you know, it's unreasonable to expect that a man who is actively being attacked by a police dog has the wherewithal to stop and be able to hold his hands up and say, I surrender, or something like that. You know, I mean, when you're being actively attacked by a dog, it's not unreasonable for the individual to respond in self-defense. And so when you, particularly in this case, where he's not out in the open, he's in a crawl space where this officer has sent in, granted a non-deadly weapon, but a very What's your best case for it being excessive force to send a dog in when the person hiding under the house refuses to come out? What's your best case for that? We shouldn't have ever sent the dog in. What's your best case that a police officer can't? I thought the circuits were in consensus that if you leave any traffic violation and run into the woods, I don't know of a circuit that doesn't say you can't use a canine because otherwise the police going to find the person could get ambushed. You can. This circuit says that, Judge. Cooper? Yes, sir. But Cooper is the person who's already surrendered and is not resisting. With respect, Judge, the way that I read Cooper is that the act of hiding, the act of running from the police, particularly in our case, is a misdemeanor because he's not suspected of a violent crime, just like Mr. Cooper. The way I read Cooper is that the act of hiding is not active resistance. Now, we may differentiate on that, but I would point, and I've looked hard at this because if we look at page 521 through 525 of Cooper, it says that hiding, Cooper was near some trash bins or something and my client was underneath the house, but the act of hiding is not active resistance. But when the officer orders him out and he doesn't come, that's active resistance. Well, that's a good question, Your Honor, because this court also shows in Trammell v. Frouge, which is a 2017 opinion, Newman v. Guidry, which is 2012 out of this court, as well as DeVille v. Marcantel, law enforcement officers have a duty to negotiate. And these cases have a question of how much is that time frame? Is it a few seconds? Is it 30 seconds to a minute? And there's no evidence in this case that Officer Cook, once he saw the hand in the crawl space holding the door, knowing that it's a stagnant situation, did any type of negotiation. Instead, while he has officers in the perimeter, he has five to seven officers in the perimeter, should have followed his perimeter hostage backup policy, he approaches the gate, snatches open the gate, yells, I have a dog he will bite, which I don't know why he couldn't have said that from away from the house. And then, according to him, client moves, sends the dog underneath. And so he escalates a use of force when we have a stagnant situation. And so he failed to negotiate. Case law requires him to give my client time to surrender. And ultimately, I think that was the demise of Mr. Schumpeter, is he never had a chance. Now, he shouldn't have ran. I agree with that. But he never had a chance to give himself up. The flow of time was just continuous. There was no break to where he could say, I give up. Because Cook testifies, I don't know any time frame between when I gave the bite order, because he's already located him. The purpose of the dog is over. We've located the suspect. But now he gives the bite order, and I don't know the amount of time between when I announced the dog and I gave the bite order. And you have to have some time, though, Judge. All right. I know you're about to have a red light. I do right now, Your Honor. Well, you do. But I'm going to ask you a question, and it's on my time. So don't worry about the light. Thank you, Judge. The point is well taken that in this scenario, you don't have a surviving witness to rebut the officer's testimony. That's the nature of the fact. The question is, as you said, you know we're dealing with qualified immunity. So given the scenario that's existent, articulate for me the violation of the clearly established federal right. And you know what the Supreme Court says about that. So not the facts. I mean, you know, I got that. But I just want to hear you before you go. Just say, you know, in this scenario, what is the articulation that the officer's violation of the clearly established federal right? We have to look at Cooper v. Brown. We do. Because that is the seminal dog bite case out of this circuit. Well, but what does the Supreme Court say about wherein the clearly established law spins from? They've told us time and again we don't look at our law. They tell us time and again we don't look at circuit law. Cases have bounced every term in which, you know, one, they say the law is not to be established to a generality. Right? Yes, sir. All right. And number two, over and over and over every term there's a case that says the circuit errs when it defines the clearly established law based on circuit law. And so, I mean, you agree that's what the court says, right? Yes, sir. All right. So I'm just asking. And I'm not trying to trick you. I'm seriously wanting to know. In this case it is difficult because there is not the competing point of view, dot, dot, dot. But that said, I'm just asking, give me a declarative sentence, not aside from a case or facts, but just give me a declarative sentence of what, if you prevailed in this case, what would the panel, how would the panel articulate the violation of the clearly established right in this case? That's all I'm asking. I know you have to have thought about that. Well, I have case law. But if you want, I don't want, if you want law from my car, that would be improper. Answer it the best way you can. Yes, sir. It's clearly established that as a police officer you can't raise the level of use of force when you have a stagnant situation. I have to keep going back to that. It's clearly established that once you have officers in the perimeter, as you're trained to have per your policy, if your policy is going to be worth anything, you have officers in the immediate area that were there within seconds, and you have a suspect identified, you don't go in and bite. You don't go in and escalate. You see his hands. You have no reason to believe they're violent. You have no reason to believe they're a danger to anybody else. And you stop. And so that's the fair warning that officers such as Mr. Cook should have had, whether they've been educated by their department on recent Mississippi case precedent or federal case precedent or not. You know you're supposed to stop. You have fair warning that you're supposed to. But instead, and we can't get into subjective motives as to whether a man's sadistic or not, you have to just stop right there and let humans do the rest. Okay. All right. Thank you, sir. All right. We've got you. Mr. Moore will be on rebuttal. All right. Mr. Hill.  Again, I'm John Hill. I'm counsel for the city of Tupelo. In the brief time I have this morning, I'm not going to argue the law. It's been briefed, and I know it's unnecessary before this panel. So what I would like to do in the time that I have is apply the facts of this case to the law to reflect that the plaintiff's claims against my client have no validity whatsoever. The essence of the plaintiff's claims against Tupelo is that Officer Cook's actions amounted to excessive force and that those actions resulted from a failure to train. Mr. Chapman will go into some detail, I'm sure, about the fact that there was no excessive force claim. Tupelo certainly agrees with that. We believe under the circumstances there is nothing to base that claim on. But beyond that, the facts are well established that Officer Cook was a well-trained officer. There's absolutely nothing to dispute that he was well-trained. The record is replete with his training certificates. They're multi-pages. They're arms-long. He, at the time of this incident, had been a K-9 officer at Tupelo Police Department for nearly three years. He had military K-9 experience. There's nothing on his record. There's no blemish on his record. There's no admonition. There's no reprimand. There's no prior incident that would give anyone an in-claim that he was not a well-trained K-9 officer. The facts clearly are that he was. Yeah, I looked at the facts. Just maybe start with, for me, what is your contention that the rule of law is as to releasing a dog with a command to bite? Is it your view that the law allows a police officer, any time there's a traffic violation, so here there was no turn signal, and then the driver or the passenger runs. Is it Tupelo's policy that it's in the discretion of the officer whether to release a dog with a command to bite just from that? No. So what is either the policy or the law on when a dog can be sent in to bite? Because I thought the Graham factors stressed the severity of the crime that the person is said to have committed. No question about that. But in that instance, it's really no different than using a taser. A K-9 is simply the second weapon for an officer. Just as if he had been a regular patrol officer, his second weapon would have been a taser. So had a patrol officer been at that scene instead of a K-9 officer, and it was just happenstance that it was a K-9 officer, but to answer your question, it is dependent on the circumstances. It's dependent on what is confronted, what that officer is confronted with, and what Officer Cook was confronted with here is that an individual fled from a routine traffic stop. That doesn't happen unless there is an underlying reason for that. That same individual ignored repeated directives to stop, to give himself up. He evaded multiple police officers. He then entered into the crawlspace of a house. I'm not a criminal lawyer, but I think that's a felony under Mississippi law. So it's not just a misdemeanor. He's hiding under that house. He's told to come out. It's pitch black at night. The officer doesn't know whether he's armed. I think you have to assume that he probably is armed because this officer was on that narcotics surveillance team. And so the question has to arise, why did he run? He doesn't run because he didn't follow a turn signal. He runs because at least there's a legitimate subjective conclusion. He runs because he has something to hide. He has done something. He is in the process or has committed a felony. And so there's a reasonable belief that he could be armed, that it's 9 o'clock on a Saturday night, that there could be residents in that house and likely are people in that house, that there could be a manner for which he could enter that house from the crawlspace or certainly there could be another exit. So with all those factors, then, and after being directed to come out, and he refuses and retreats further in, the officer used his second weapon, which was the canine. Had he been a regular patrol officer, he likely would have used a taser. I think it's a difference without a distinction here. And so to tell you what Tupelo's policy is in each instance, I can't. It is discretionary and it's case by case. But you're right. Had all he done was get out of the car and not obey the command to get back in the car, tasing him or putting a dog on him would have been excessive force. I agree with that. But that's not what happened here. And beyond that, from the city's perspective, there's no respondent superior here. There's absolutely nothing in this record to show a policy, practice, or custom related to excessive force, nor is there anything in this record to show a policy, practice, or custom related to deviations from the standard operating procedures. Chief Aguirre did it this one time for Officer Cook, three years before the incident happened. Based on the plaintiff's argument here, this is essentially a race that once he did that, that he had been a canine officer for three years with no incident, but they say, well, he's inadequately trained because he didn't have the three years patrol experience when he was made a canine officer. Well, it's five years thereafter or nothing. It happened today. Is that enough? It's ten? So essentially they're making a race ipsa argument related to the training of an officer where there's absolutely nothing on the record to reflect that he's not well trained and qualified. Did Tupelo's guidelines at all speak to if a person is trapped and you have other officers all around you, better practices to wait until the situation is secured or there's no real direction in that regard? There's no specific direction. What I would say to that comment is, sure, there were other officers in the area and officers arrived within a couple of minutes after the shots were fired, but those officers also said they didn't know where Cook was. They followed the sounds of the shot. So let's look at what his alternatives are, which is the very reason why I submit to you that Judge Aycock was absolutely correct in granting some of the judgments. You can't sit back and 20-20 hindsight, but let's look at what his options were. He didn't know the address. Pitch dark. So if he called in, all he says is, I'm in the backyard of somebody's house on Harrison Street. It's pitch dark. He's in the crawl space. Well, again, you don't know whether he's armed. He's told to come out. And so all of the things that the plaintiff said, well, he should have done this, he should have done that. Well, yeah, it's a fluid situation, and he had to make split-second decisions, and he made those split-second decisions based on the information available to him. There's nothing to suggest that had he done something different, Mr. Shumpert's actions would have been any more reasonable, substantively, later than they were then. The dog goes in, or he's shot with a taser, whichever it is. Mr. Carr says, well, what should he do then? Well, he should give up. It's what he should have done to begin with. You call in another officer. Okay, you have two officers there. Mr. Shumpert, we have two officers here. Give yourself up. It's pure supposition to say that it ends differently under those circumstances. We're dealing with somebody who ran from a traffic stop, a routine traffic stop for no good reason, who evaded police, who got up under a call space, was told to come out, refused to do so, retreated back into the house, and when the second weapon, the dog, as opposed to a taser, was utilized, he assaulted a police officer. And so, you know, we can all sit here and say, well, Officer Cook might have done something different. Sure he might have. But what he did was reasonable under the circumstances. Again, confronted with somebody that he – I would have assumed he was armed. I would have assumed somebody was in that house. I would have assumed that there's danger to residents of the city of Tupelo, and it's his sworn duty to protect those residents. In these sole survivor cases, you would agree that it would – that the sole survivor's testimony, in this case Officer Cook's, has to be completely consistent, at least with itself, in order for us to assess the Graham factors properly? It has to be consistent, and I submit to you that it is. I mean, what he says is the man attacked me and beat me around the face. I mean, we have a half dozen or more officers and medical personnel who cooperate there. Photographs show that he was beat around the face. He says he was losing consciousness. There's nothing to dispute that fact, and he shot in self-defense. My time's up. I'll be pleased to answer any further questions. If not, I'll turn the dice over to Mr. Chapman. All right. Thank you, Your Honor. Thank you, sir. All right. Mr. Chapman. Thank you, Your Honor. If you don't mind, I'll just start you right where you finished. In a sole survivor case, it's critical that the government's testimony be undisputed, and your co-counsel just stated the two undisputed facts were that he was being attacked, then beaten, and then shot in self-defense. Yes, sir, Your Honor. The points of fact that seem to be possibly in dispute as to whether that narrative is true is what I was looking at Officer Cook's statements. At one point, he said the dog bit and didn't release until I pulled the dog off. Then the story changes completely to the dog bit, but then Mr. Schoomper fought him off, and the dog only had his shirt, at which point Schoomper charges me. If there is testimony in the record from Officer Cook that, in fact, somewhere between the moment in the house and the shooting, Officer Cook had the time to take the dog's mouth off Schoomper, that would be completely inconsistent with his story of a steady attack and shooting in self-defense. Do you agree with that? If that fact exists. Okay, so if the fact exists that Officer Cook did say in the various statements that there's a moment where the dog had to be pulled off by him, that wouldn't be... There's no way we could harmonize that with his story of being beaten to the ground and shooting. Your Honor, I think that statement, and I am familiar with his deposition, and he was asked the question numerous times related to that. The Officer Cook indicated that once he had fired the shots, he then got himself up and pulled the dog off of Mr. Schoomper and held lethal force on him until the other officers arrived. So the dog re-attacked? I thought Cook also said he never gave a second bite command. So how could the dog have been off the man, no injuries on him? If it's accepted by the government there were no injuries, how is he pulling the dog off the man? The dog would have to have had an injury inflicted if he's bitten the guy enough to be pulled off. The proof in this case, the canine in this instance has no canine teeth. In addition... The dog has no teeth? Has no canines. Does not have the canine teeth. But when the officer pulled him off of Mr. Schoomper, at that point in time, whether or not the dog had come out from under the house after being removed and apparently engaged back with Mr. Schoomper, it wasn't on a second command of Officer Cook. He had never at any point in time given a command to cease. Again, just because in these cases there's just one survivor and so it has to be scrupulous that at least the government's theory of serious risk of harm has no internal inconsistency. But now I think I understand. You agree that Officer Cook did at some point say he pulled the dog off and I thought that would have been impossible with the similar story being the dog had been beaten off and then the man charged him. But this was a second re-engagement and he pulls him off afterwards. Pulls him off after he has fired his shots and gets up from Mr. Schoomper and then he says that he then pulls the dogs off. The other, and then I'll stop, the other fact point, I just want to be certain that this story is consistent and is undisputed. I thought the medical testimony did indicate that the fourth shot to the thigh, wound D, was not close range, was distant. And so opposing counsel said consistent with an offensive shooting rather than on the ground being beaten, shot, shot, shot, shot. I thought there was one shot where the government's autopsy confirmed that it was a distant shot. Do you remember that testimony? I do not, Your Honor. And by distant, I'm not certain what that would reflect if it means guns not directly against him. Well, you remember that their expert Mitchell said that the fourth shot was consistent with actually Schoomper, I mean Officer Cook, being above aiming down at Schoomper instead of being beaten and shooting. Do you have any memory of Mr. Mitchell's expert opinion being that? I do, Your Honor, and I think the district court judge was correct that we would contend there's certainly admissibility issues with the medical expert report. But aside from that, even taking that account, the officer, there is no clearly established law that states that it is objectively unreasonable for an officer to fire a gun simply because he happens to be on top of the suspect. In this particular instance, the suspect in Montez v. Portavent, for instance, was 15 feet away from the officer. A similar scenario wherein the officer has been in a physical confrontation with the suspect, has been hit in the head, and is at a near point of unconsciousness, and in that case, the suspect being 15 feet away, literally moving away from him, that those shots, use of deadly force, was determined not to be objectively unreasonable. Well, following up on that, my recollection is that the testimony said all four shots came in quick succession. There was no time gap, apart from physical location gap, between the third and fourth shots. Is that correct? That is correct, Your Honor. All right, and the medical testimony about the shot in the, I think, hip or groin or whatever it was, was not close or was distant. Is that correct? I'm not certain. Judge Henderson indicated that to be the case. But there is no testimony, medical or otherwise, about how distant that was. That is correct, Judge. And again, I'm not aware of that distance. So, as opposed to powder burns on the body with the first three, if the gun is a foot away, it may not leave powder burns. So my point is, are you aware of any inconsistency, which is what Judge Higginson was looking for on the single witness theory, that the fact that there are four rapid succession shots and one of the four is classified as remote, that doesn't mean it's not consistent. That is correct, Your Honor. This was obviously, it's a physical confrontation. There's a tussling going on. Officer Cook is attempting to defend himself during this as well as to try and fight back. He is being, of course, beat in the face and head. As he nears that point of unconsciousness, he begins to fire the shots. The testimony of all witnesses, including Mr. Foster, one of the plaintiffs, was that the shots were in succession, bam, bam, bam, bam. The Officer Cook, as this court is aware, it has been stated numerous times that an officer is allowed to use deadly force as long as there is a threat of serious harm to the officer or others. In this instance, and I think Plumhoff has said that once an officer begins to shoot, he can continue shooting until that threat has ended. And in this instance, the officer ultimately fired four shots. The four shots themselves, after having been fired, the exact position of Mr. Schumpert during that is, of course, not known, other than once the fourth shot has taken place, Officer Cook's testimony is, at that point, I was removed from Mr. Schumpert and retrieved the K-9 off of the suspect. Well, am I correct that there is no evidence in what sequence this so-called remote shot came? It could have been the first or second or third or fourth. That is correct, Your Honor. There was none. And I would say that, in addition to that, it is worth noting that when Schumpert came out from under the home, charged Officer Cook that Officer Cook did not shoot and engage at that moment. Schumpert was a semi-pro football player. He tackled him to the ground. He attempted to try and physically defend himself, and it was only when he was unable to do so that he ultimately determined and decided to use deadly force in that manner. Thank you, sir. Thank you. Mr. Moore, you have rebuttal. Yes. May it please the court. A plaintiff can overcome qualified immunity defense by showing that the official violated a statutory constitutional right. The right was clearly established at the time of the challenged conduct, and if so, was the conduct of the defendant objectively unreasonable? According to clearly established law, the appellant would present that, according to ground versus Connor, when you undertake the objectively reasonable analysis, those factors favor and favor of Mr. Schumpert. The severity of the crime at issue, this was a traffic stop. It was not a felony. It was a traffic stop. The lowest level misdemeanor there is fell into civil property. An immediate threat to others or the officer, Officer Cook admitted that he was no threat to him. He did not think it was a threat to him or others at the time he interacted with Mr. Schumpert. And whether Mr. Schumpert was actively resisting arrest or attempting to evade arrest, now, the district judge said that the incident was not stagnant at the time Mr. Cook came in contact with Mr. Schumpert, but Mr. Aguirre, the chief of police, used the word stagnant. He says it was a stagnant situation. There was no reason for Mr. Cook  It may have been okay to have the dog to help him find the individual, but once he found him, there was no urgent situation. What does that mean? A stagnant situation? A stagnant situation. If it's stagnant, and that's by the defense's own witness, the chief of police, you cannot be, nobody's moving. You're still. There's nobody actively fleeing or resisting arrest. It's stagnant. He's there in the crowd space, and he's holding the door. He's there. And basically, he's trapped. He's barricaded in. He can't go anywhere. If he comes out, you're going to immediately arrest him. If he goes further in, you can wait him out. You can negotiate. They had policies that Cook failed to. Am I correct that the record shows that even though there was a traffic stop, the police suspected these people of being engaged in drug trafficking and they were just looking for a traffic stop excuse to stop and check them. We do know that there have been some surveillance of a hotel, and they did suspect these individuals of being involved maybe in drugs, and we So, in the minds of the police, the running by Mr. Schumpert was not because he was afraid of getting a traffic ticket, but because in the minds of the police, he was evading a drug transaction stop. At this time, according to Mr. Cook's testimony, he didn't know exactly why. No one knew why he was running. It is plausible that they could have thought he was running because of drugs, but even drugs in and of itself would not be a violent crime to necessitate the use of deadly force. And so, I think the post or case of the Graham factors under Graham versus Conner were these reasonable actions objection to reasonable actions by Mr. Cook. The two constitutional violations would be a Fourth Amendment violation for the use of excessive force and the other constitutional violation that was clearly established was the 14th Amendment right to be free of state occasion damage to bodily integrity. What's your best or closest case? I'm not required to have an identity, but I mean we sort of all know what the factors are. You know, and the law is very tight in this area as you well know. So, in this scenario with the dog, et cetera, what's the best case that you provide to us? You know, in this case articulating the violation of, and it's clearly established right by the officer given all that's been said. I know you've cited the Graham factors, but, you know, and we know what's in the brief, I mean, but is there a scenario, I mean, there are plenty of them with a defendant fleeing, et cetera, et cetera. It's fast, you've got the record, you've got factual disputes, but where does this case fit in? Is there a case or is it your position this is, you know, kind of nuanced that doesn't fit any of the cases we have? Like the court, the district court found in the Cooper versus Brown case, we would believe that this case should be viewed in the hope exception. In the Cooper versus Brown case, they could not articulate a particular set of facts that had been announced by this circuit, or any circuit that fit the situation, but it was clear that you don't allow a dog to continue to bite somebody after they are almost in handcuffs. And here, you don't double team somebody, you have a dog, you gave the bite command and you never gave the release command, and the dog continuously bites this man, the man fights him off to an extent he gets out and the dog reengages and you never Okay, stop, stop there, those are, you made two facts that are consistent with the government that therefore, so you say almost in handcuffs, I thought the testimony was even after he was shot four times he resisted having handcuffs put on him. So he's been shot four times, I thought the testimony was almost in handcuffs and then he would not allow them to handcuff. He resisted the handcuff. So when you say almost handcuffed, hence equivalent to Cooper subdued, that's not correct with the facts here. There was testimony about Okay. That he did continue to Okay. And then the second thing, you did just agree with them that the dog reengaged. That would make sense because in your brief, you never did perceive the inconsistency that I thought might exist. But so you agree with them that the dog had to be pulled off because it reengaged afterwards. We believe according to Cook's testimony that That's what that makes sense. Okay. Pulled him off until the very end. Okay. So the dog would have been attacking him while Cook was shooting him. Right. So that was clearly excessive. A dog should have been able to handle the man or a human but he didn't need both of them. And so we would say that the Cooper versus Brown or the Hope exception applies. We would say it created danger. So when you say that's applicable it works against the proposition you just tucked in. In this instance, Your Honor, if this was dealing with a private actor, I would say that was so but as Judge Weiner pointed out in his testimony in the State of Columbia, it's always been sacrosanct that you had a right to not be damaged by a state actor. This was a state actor. And so you don't have to get to the state created danger. You don't have to be a state actor, not a private actor. You're not urging in the tier of arguments this is a state created danger  are you? I'm arguing simply that his bodily integrity was violated pursuant to the 14th Amendment. We did raise the 14th Amendment in our complaint. We raised the 4th Amendment in our complaint. My question is, are you or are you not asserting a state created danger theory as one of the theories of liability in this case? Your Honor, we are asserting a state created danger in this case, but it's a state created danger for a state actor, not a private actor. And I believe the confusion in this circuit has been whether or not it applied to the actions of a private actor, whether or not you could hold the state actor accountable. In this instance, like it was in Doe v. Taylor, the actors were state actors, and in that case they held the principal accountable for the teacher's sexual assault of that student. Well, we've gone in bank and around and around on state created danger, and I can just tell you the circuit does not recognize the state created danger theory. That was not your primary, but it was raised in the fly brief, and we got a supplemental brief from the state just pushing back on it. So while you're at the podium, I just wanted to ask about it, but we've got the full briefing. I mean, it's obviously a very complex, serious case with a lot of briefing and a lot of depositions, and we've already looked at a lot of it, and we'll look at some more of it and pour through it, but your answers to our questions are helpful for us to get a grasp on what the issues are. So in due course, the case is submitted, and we'll give it our best shot to get it  Thank you.